REDWINE V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO.  2-03-321-CR

SCOTT NELSON REDWINE APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Appellant Scott Nelson Redwine appeals his conviction for felony driving while intoxicated (DWI).  A jury found Appellant guilty and assessed his punishment at five years’ confinement.  The trial court sentenced him accordingly.  In two points, Appellant challenges the legal and factual sufficiency of the evidence to support his conviction.  The parties are familiar with the facts, and the controlling law is well-settled.  We will affirm.

Because Appellant raises a factual sufficiency complaint, we will discuss the most important and relevant evidence that supports his complaint.
(footnote: 2)   Deputy Sheriff Jason McCall testified that, on December 17, 2002, he observed a truck drift toward the yellow line in the middle of FM 455 before the vehicle swerved to the right across the solid white line.  Deputy McCall also stated that he observed the truck maneuver two S-shaped curves but that the truck then drifted over to the left into oncoming traffic, at which point Deputy McCall turned on his overhead lights.  According to Deputy McCall, the driver of the truck did not pull over, so Deputy McCall turned on his sirens and followed him for approximately half of a mile to a mile.  Deputy McCall testified that the truck eventually pulled over into a driveway to a house and a nearby mobile home and that Appellant got out, stumbled, and “fell into the side of the box enclosure that’s on the back of the truck.”

Deputy McCall approached Appellant, identified himself, and asked for Appellant’s identification.  Deputy McCall testified that Appellant “had glassy red eyes, slurred speech like he was kind of thick tongued, [and] a strong odor of an alcoholic beverage about his person.”  Deputy McCall testified that, because Appellant was staggering as he walked, he told Appellant to wait in his truck while he ran a computer check on his license.  Ignoring Deputy McCall’s request, Appellant got out of his truck, walked to a gate opening into a pasture, and stepped over a barbed wire fence in the field.  Deputy McCall yelled at Appellant to stop, but Appellant started jogging in response.

Deputy McCall ran after him through the field and caught up with Appellant on the porch of a mobile home.  As Appellant was fidgeting with a locked door, Deputy McCall grabbed Appellant’s belt loop and arrested him. According to Deputy McCall, Appellant was “staggering left and right,” and at one point, he had to grab Appellant, who stumbled, to prevent him from falling to the ground.

Deputy McCall testified that he thought Appellant was intoxicated and that there was not an opportunity to conduct any field sobriety tests at the roadside stop because Appellant fled and then became uncooperative.  While Appellant was being driven to the station, he was belligerent, cussing, and calling Deputy McCall a “punk rookie,” among other things.

Deputy McCall testified that this was his first DWI arrest, but he testified that he had previously encountered people who were intoxicated.  Deputy McCall testified that, based upon his training, his experience, and his observations of Appellant’s behavior at the scene of the stop, he believed that Appellant was intoxicated at the time he stopped Appellant.

Deputy Jeffrey Coats testified that he assisted Deputy McCall at the intoxilyzer room on December 17, 2002 a little after midnight “with a suspect believed to be intoxicated.”  Deputy Coats stated that when he first observed Appellant, Appellant was “verbally belligerent and had an odor of alcohol about his breath.”  Deputy Coats also testified that Appellant’s eyes were bloodshot and red.  Deputy Coats testified that he recorded the events in the intoxilyzer room on videotape.

During trial, the State played the videotape from the intoxilyzer room for the jury and questioned Deputy Coats about what happened in the intoxilyzer room as it appeared on the tape.  Deputy Coats first asked Appellant to stand in a black box on the floor and to face the camera so that he could perform field sobriety tests on Appellant.  Appellant refused to face the camera and then sat down in a nearby chair.  Deputy Coats read Appellant his statutory DWI warnings and asked him what his name and date of birth were.  Appellant repeatedly referred to the police as “pricks” and ”motherfuckers” and claimed that he was wrongly taken from his house.  Appellant also repeatedly asked whether the camera in the intoxilyzer room was working, and he stated that he had a video camera on his house.

According to Deputy Coats and the videotape, Appellant refused to give a breath specimen, and he refused to perform any field sobriety tests in the intoxilyzer room.  Deputy Coats testified that, based on his training and experience and his observation of Appellant in the intoxilyzer room, Appellant had lost the use of his mental and physical faculties from the consumption of alcohol.

At trial, Appellant testified on his own behalf and presented a different story of what happened.  He first apologized to the court and to the jury for his language, “[n]ot the meaning of it, but the words I used.”  Appellant testified that he had used such language because he had been wrongly accused and arrested.  Appellant testified that he lives off of FM 455 on Bobby and Johnny Marriott’s property.  Appellant admitted that, after he ate a sandwich from Burger King, he went to a bar named the Four Horsemen around 8:30 p.m. and stayed until midnight, having a beer an hour.  When asked how many total beers he drank, Appellant responded, “Four at the max.”  Appellant testified that he had no other alcoholic drinks that night.

Appellant testified that his home was around three miles from the Four Horsemen and that he drove his Ford truck home.  Appellant denied being intoxicated when he left the bar and stated, “I don’t drive when I’m intoxicated.  I drive when I’m drinking, but I don’t drive intoxicated.”  Appellant admitted that he has been in trouble before for DWI, but he testified that “[t]hat is why I don’t drive drunk” anymore.
(footnote: 3)
 Appellant disputed Deputy McCall’s testimony about other cars being on the road and claimed that he could not remember crossing the lines, adding that if he had, it was because his “old truck is sort of loose.”  Appellant testified that he did not see any lights or hear any sirens while driving down FM 455.  On cross-examination, Appellant testified that he would have stopped if he had heard any sirens.  Appellant testified that he pulled into his driveway, put his truck in park, and got out of his car.  Appellant testified that he went through his gate, went over to the fence, crossed it, and was there “talking to [his] wolf” when Deputy McCall approached him.  Appellant then clarified that he was petting his dog.

Appellant testified that Deputy McCall told him he was being arrested for DWI and that he was “in shock.”  When asked whether he was angry, Appellant responded, “Oh, upset, angry.  I mean, it was like destroying America right there, you know.  I was mad.”  Appellant testified that Deputy McCall did not ask him any questions, conduct any field sobriety tests on him, or look at his eyes.  When asked whether he had difficulty walking to Deputy McCall’s car, Appellant testified that he had “arthritis real bad” and that his “shin bones are bowing out.”

Appellant again apologized to the court and the jury for how he acted in the intoxilyzer room, as shown on the videotape.  Appellant testified that the reason he sat in the chair was because he was “being defiant,” and he acknowledged that Deputy Coats “probably” wanted him to stand up.  Appellant explained that he did not take a breath test “[b]ecause they can be manipulated.”  Appellant also testified that he thought “his buddy” had put a camera on his barn, so that was why he had said on the tape that there was a camera on his house and the Marriott’s house.  On cross-examination, the State asked Appellant,

[I]t’s your testimony that you’re just standing on your -- or right there at the front door of your residence petting your dog and this officer just walks up behind you and calls you by your name for no reason at all and handcuffs you and takes you to jail, tells you he’s arresting you for driving while intoxicated and takes you to jail.  And that’s your -- what you story is, that’s what he did.

Appellant responded, “Absolutely.”  Appellant then called eight witnesses who testified to his reputation for truthfulness in the community.

The jury heard and considered the testimony of the two officers involved with Appellant on the night of his arrest.  The jury also saw the videotape made of Appellant while he was at the station and was therefore able to view and consider the quality of Appellant’s speech, demeanor, mannerisms, and walk shortly after he was arrested.  Further, the jury heard and considered Appellant’s own account of the events leading up to and following his arrest and from several witnesses who vouched for his reputation for truthfulness in the community.  After hearing and considering all of the evidence presented, the jury found Appellant guilty of felony DWI and assessed his punishment at five years’ confinement.

Based on our review of the testimony, videotape, and other evidence, under the applicable standards of review,
(footnote: 4) giving due deference to the factfinder’s determinations, we conclude that the evidence presented at trial was legally and factually sufficient to support Appellant’s conviction for felony DWI.

We therefore overrule Appellant’s two points and affirm the trial court’s judgment.

ANNE GARDNER

JUSTICE

PANEL B: HOLMAN, GARDNER, and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  August 12, 2004

FOOTNOTES
1:
See 
Tex. R. App. P. 
47.4.

2:
See Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

3:
The State offered into evidence Appellant’s stipulation to two prior DWI convictions.

4:
See Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (providing legal sufficiency standard of review); 
Burden v. State
, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001) (same); 
Zuniga v. State
, No. 539-02, 2004 WL 840786, at *4, 7, 9 (Tex. Crim. App. Apr. 21, 2004) (stating factual sufficiency review standard).